AAS:JMH
F. #2017R01525

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

NAUSHAD KHAN,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

TO BE FILED
UNDER SEAL

COMPLAINT AND
AFFIDAVIT IN SUPPORT
OF AN ARREST WARRANT

(18 U.S.C. §§ 1344 & 1349)

No. **18-MJ-1062**

EASTERN DISTRICT OF NEW YORK, SS:

      BRIAN P. SHERRY, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

## CONSPIRACY TO COMMIT BANK FRAUD

      In and around and between 2011 and 2016, within the Eastern District of New York and elsewhere, the defendant NAUSHAD KHAN, together with others, did knowingly and willfully conspire to execute a scheme and artifice to defraud one or more financial institutions and to obtain moneys, funds, credits and other property owned by, and under the custody and control of, one or more financial institutions, by means of material false and fraudulent pretenses, representations and promises.

      (Title 18, United States Code, Sections 1344 and 1349)

The source of your deponent's information and the grounds for his/her belief are as follows:[1]

1. I am a Special Agent with the Federal Bureau of Investigation ("the FBI"). I have been an FBI Special Agent for more than eleven years. As a Special Agent, I have investigated numerous matters during the course of which I have interviewed witnesses, conducted physical and technical surveillance, executed court-authorized search warrants and used other investigative techniques to secure relevant information.

2. I have personally participated in this investigation. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file, including the defendant's criminal history record; and from reports of other law enforcement officers involved in the investigation.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1344 and 1349 have been committed by NAUSHAD KHAN, together with others, within the Eastern District of New York and elsewhere.

**Introduction**

4. NAUSHAD KHAN, the defendant, is a resident and citizen of Pakistan. He is the owner-operator of Hashtnagar Arms Company ("Hashtnagar"), which is a business principally engaged in the distribution of firearms, ammunition, weapons and other military equipment. Hashtnagar's principal base of operations is Peshawar, Pakistan. The defendant is approximately sixty-one years of age.

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

5.      As part of his operation of Hashtnagar, the defendant has brokered numerous transactions involving firearms, ammunition and related products with companies located outside Pakistan. In order to effect payment for several of these transactions, the defendant and one or more co-conspirators have sent or caused to be sent numerous wires that pass through the United States, via U.S. dollar clearing banks located in the United States, including banks located in New York, New York. Based on my training and experience, I know that bank wires to and from the New York City area pass through the waters in the Eastern District of New York.

6.      Due to my training and experience and my participation in this investigation, I know that arms transactions involving certain countries or persons can and do invite scrutiny. For example, there are numerous statutes and regulations that restrict the ability of individuals and companies to use U.S. dollar clearing banks to effect payment for goods and services intended for certain countries and/or certain designated persons or companies. Similarly, certain types of products—such as firearms, ammunition and military equipment—are subject to restrictions and/or disclosure requirements.

7.      Based on the foregoing, I know that U.S. banks scrutinize overseas wire transfers in order to confirm that the transaction does not run afoul of the above-described restrictions, especially where the wire transfers appear to involve sanctioned countries (i.e., countries to which no goods or services may be provided, such as the Islamic Republic of Iran), adjoining countries, and/or sanctioned persons (i.e., specific persons to whom no goods or services may be provided).

8.      Based on my training and experience, I know that individuals will sometimes disguise the purpose of their wire transfer in order to avoid raising suspicion.

One common scheme is to misrepresent the nature of the goods or services being sold or distributed, or to disguise the end user or consumer of the product. Based on my participation in this investigation, I know that financial institutions are aware of this scheme as well.

9. For example, in the course of this investigation, FBI agents have spoken with an investigator at a global financial institution with significant operations in New York, New York ("U.S. Bank A") ("the U.S. Bank A Investigator"). The U.S. Bank A Investigator noted that U.S. Bank A would scrutinize any wire transfer indicating that its purpose was related to firearms, up to and including stopping the wire transfer. By contrast, if the purpose of the transfer was deliberately masked as something more innocuous, U.S. Bank A would be more likely to permit the transfer to go through. The U.S. Bank A Investigator made this observation in connection with specific wire transfers attributable to KHAN, Hashtnagar, and KHAN's co-conspirators, that passed through U.S. Bank A, as further described below.

**KHAN's Efforts to Conceal Purchases of Firearms**

10. In the course of this investigation, the FBI has obtained emails from an email account associated with KHAN ("KHAN Account A").[2] I believe that KHAN Account A belongs to KHAN for several reasons, including but not limited to the fact that he signs many of the sent emails therein as "N. Khan" or "NK."

---

[2] These emails were obtained pursuant to a search warrant authorized by the Honorable Philip J. Green, United States Magistrate Judge for the Western District of Michigan, under Magistrate Docket No. 18-02 (W.D. Mich. Jan. 12, 2018).

11. In summary, the information obtained from KHAN Account A indicates that KHAN and his associates take steps to avoid scrutiny and detection of his arms-trafficking activities and those of Hashtnagar.

12. For example, in and around and between June 2014 and June 2015, KHAN attempted to purchase handguns from a company based in Turkey ("Turkish Company A"). In summary, the attempted transaction involved 400 semi-automatic pistols at an aggregate sale price of approximately EUR 100,000. The total price of this transaction fluctuated, apparently due to the approximately 13 months that passed while the parties endeavored to complete it.

13. KHAN received numerous documents via email from Turkish Company A that made clear that the transaction involved firearms. For example, on June 9, 2014, KHAN received a copy of an invoice dated June 6, 2014, on Turkish Company A letterhead, that described three models of 9mm handguns and one model of a .40 caliber handgun, 400 pistols in total. KHAN forwarded this email to his employees at Hashtnagar, including Co-Conspirator 1 ("CC-1") and Co-Conspirator 2 ("CC-2").

14. When KHAN attempted to consummate the transaction, however, he made clear to Turkish Company A that he could not do so directly or openly, because the purchase involved firearms. For example, in early October 2014, KHAN told an employee of Turkish Company A by email that Hashtnagar had advised Hashtnagar's local bank to transmit funds, but that Hashtnagar's local bank could not do so because Turkish Company A produced arms. KHAN then stated that he had asked some "Afghan and Dubai friends" for some form of assistance.

15. In late November 2014, KHAN sent an employee of Turkish Company A an email regarding a payment for EUR 50,000, noting that Hashtnagar had given the invoice to Hashtnagar's bank in support of the transaction, and so that the Turkish Company A employee could confirm the details of the transaction with Turkish Company A's bank. KHAN added that it was "very difficult" to transact money for firearms; accordingly, Hashtnagar's version of the invoice identified the products to be purchased as "LED TORCH[ES]."

16. The emails from KHAN Account A, unless specifically noted otherwise, are in English. In this context, I note that, in British English, "torch" is a synonym for "flashlight."

17. KHAN attached an invoice, purportedly issued by Turkish Company A to "Sapna Enterprises, Office 2, Gul plaza GT road Peshawar," for 25,000 "LED TOURCH [sic]," at a cost of two EUR per unit, for a total of EUR 50,000 ("the LED TORCH Invoice").

18. While I am not an expert in analyzing documents for signs of forgery, there are some obvious indications of forgery in the LED TORCH Invoice. First, the invoices KHAN received from Turkish Company A have a footer with street address and contact information located in the lower left-hand corner of the invoices. By contrast, the LED TORCH Invoice sent by KHAN does not include this footer; instead, the address and contact information is centered in the top of the page, in a different font and type setting. Second, the LED TORCH Invoice includes the following text at the bottom: "The above information is correct in [sic] verified", in reference to the description of the goods. This text is absent from the invoices KHAN received from Turkish Company A. Third, KHAN

received two similar invoices from Turkish Company A bearing what appears to be a hand-applied letterpress stamp, over which an employee had put their signature. By contrast, the LED TORCH Invoice <u>sent</u> by KHAN bears what appears to be an enlarged, electronically-cut-and-pasted image of the stamp and signature from an earlier invoice (specifically, the invoice referenced in ¶ 12, above). In particular, the distinctive signature appears to be identical, down to the placement of what appears to be an inkblot in the upper right-hand corner of the signature.

19. In 2015, KHAN and his associates attempted several times to remit payment to Turkish Company A. For example, in early February 2015, CC-2 sent KHAN what appears to be evidence of a wire transfer for EUR 106,150 by email, which KHAN then forwarded to an employee of Turkish Company A the following day with the message: "Please book our Pistols to Islamabad airport." The payment information, however, stated that the "Remittance Information" was "IMPORT OF TEXTILE." The beneficiary of the payment was Turkish Company A; the payer was not Hashtnagar but another company with an address in Dubai, United Arab Emirates. The employee of Turkish Company A queried whether the payment was in fact on behalf of Hashtnagar, to which KHAN replied that it was, noting the "several channels" attempted over the past six months, and that "[a]t last one friend helped us[.]"

20. Unlike other transactions detailed below, it appears this payment was not successfully received by Turkish Company A. In a later email, however, KHAN stated that any invoice with Turkish Company A could not refer at all to firearms, noting that Turkish Company A would "get no payment for ever from Pakistan" if the invoice identified pistols as the products at issue.

**KHAN's Multiple Purchases of Firearms Using U.S. Banks**

21. KHAN has committed bank fraud and conspiracy to commit bank fraud against multiple U.S. banks via similar means, that is, by masking the true nature of his arms purchases as something other than weapons.

22. For example, based on my review of records obtained from U.S. Bank A, I know that U.S. Bank A processed a series of wire transfers in and around and between January 2011 and August 2011 that are relevant to this investigation. In each, the "originator" was CC-2. The "beneficiary" for each transaction was listed as Chinese Manufacturer A. Based on my training and experience and my participation in this investigation, I know that Chinese Manufacturer A is a weapons manufacturer. However, in the U.S. Bank A records, the purpose or "Bank to Bank Instructions" for each of these transactions was listed as something other than firearm, such as "Pipe Fitting" or "Sundry Goods." The collective amount of these wire transfers sent by CC-2 for the benefit of Chinese Manufacturer A was nearly $800,000.

23. In and around and between 2013 and 2016, Hashtnagar purchased several hundred handguns and compatible magazines from a U.S.-based firearms dealer ("U.S. Company A"). Based upon documents obtained from U.S. Company A and statements provided by the principal of U.S. Company A, as well as documents obtained from other sources via subpoenas, I know that Hashtnagar, via KHAN and his co-conspirators, misrepresented the nature of the transaction to the banks that handled the payments. In particular, in and around 2015, KHAN and his associates, to facilitate Hashtnagar's purchases from U.S. Company A, directed or attempted to direct multiple bank wires for the benefit of U.S. Company A to an account held by U.S. Company A at "U.S.

Bank B," a financial institution with a base of operations in the state of Virginia, via interbank transfer from "U.S. Bank C", a global financial institutions maintaining U.S. operations in New York, New York, and U.S. Bank A, as set forth below:

| Date Received by U.S. Bank B | Interbank Transferor | Entity Identified as Originator | Amount | Description of Transaction's Purpose |
| --- | --- | --- | --- | --- |
| 1-June-2015 | U.S. Bank C | Dubai Company A (Dubai, U.A.E.) | $34,745 | "IMPORT OF CAMPING TENTS" |
| 16-June-2015 | U.S. Bank C | Dubai Company A (Dubai, U.A.E.) | $60,840 | "IMPORT OF CAMPING TENTS" |
| 7-July-2015 | U.S. Bank C | Dubai Company A (Dubai, U.A.E.) | $78,240 | "IMPORT OF CAMPING TENTS" |
| 19-Oct-2015 | U.S. Bank A | Dubai Company B (Dubai, U.A.E.) | $19,444 | "IMPORT OF CAMPING TENTS" |
| 7-Dec-2015 | U.S. Bank C | Dubai Company C (Dubai, U.A.E.) | $43,700 | "IMPORT OF SPORTING PRODUCTS" |

24. In each of these wires, the true nature of the transaction was masked as something other than firearms, and the true destination and acquirer—Hashtnagar in Pakistan—is not identified at all. Rather, each of the originators of funds are purportedly based in Dubai, United Arab Emirates ("Dubai Company A," Dubai Company B," and "Dubai Company C"). Emails obtained from KHAN Account A include emails with the principal of U.S. Company A, in which it is clear that the principal of U.S. Company A knew and understood that the goods to be transacted were firearms and related products, not "camping tents" or "sporting products."

25. I also know that, according to the principal of U.S. Company A, the handguns acquired by Hashtnagar from U.S. Company A were shipped through the Eastern District of New York. U.S. Company A engaged a shipping company that routed the

handguns through a facility located in Queens, New York, within the Eastern District of New York. The handguns departed the United States via John F. Kennedy International Airport, on various dates in and around 2015 and 2016. Records obtained from this shipping company corroborate the information obtained from U.S. Company A.

**KHAN's Masking of Other Purchases of Firearms Using U.S. Banks**

26. There are numerous other examples of KHAN and his associates masking the nature of purchases of firearms, ammunition and accessories as more innocuous items.

27. For example, a wire transfer in September 2015 for $79,925 was described as "IMPORT OF BICYCLE PARTS." This wire passed through the New York, New York branch of U.S. Bank D, a global financial institution with significant operations in and around the New York area. In reality, based on the information I have obtained from KHAN Account A and bank records obtained pursuant to subpoenas, I know that KHAN was not purchasing "bicycle parts" but rather 200 M4 model assault rifles from a Chinese manufacturer ("Chinese Manufacturer B"). The rifles were shipped by Chinese Manufacturer B to Pakistan upon receipt of this payment.

28. Similarly, in December 2015 and January 2016, wire transfers for $59,932.65 and $59,920.00, respectively, were described as "IMP OF BMX." Based on my training, experience and participation in this investigation, I believe "IMP OF BMX" was meant to be understood as "Import of BMX," i.e., the common abbreviation for bicycle motocross. This wire passed through U.S. Bank A.

29. In reality, based on the information I have obtained from KHAN Account A and bank records obtained pursuant to subpoena, I know that KHAN was not

purchasing "BMX" related items but rather firearms as KHAN exchanged numerous emails with an employee of Chinese Manufacturer B in connection with this wire, including some in which they exchanged ledgers of goods purchased and shipped against payments received. All of the ledger items appear to refer to firearms, including references to M4 model rifles and T11 model handguns as well as "ammo" (ammunition) of various calibers. Importantly, the ledgers include entries reflecting payments dated December 17, 2015, and January 14, 2016, both in the amount of $60,000. I believe that these ledger entries correspond to the wires described above, net of the costs of the wires. Moreover, in one of his emails to the employee of Chinese Manufacturer B, on which CC-2 is copied, KHAN attaches one iteration of the ledger and requests information on his shipments of "M4 rifles," "9 x 19 mm ammunition," and "T11 Pistols."

30. None of the entries on the ledgers exchanged by KHAN and the employee of Chinese Manufacturer A appear to relate to BMX or any bicycle-related products and, to my knowledge, Chinese Manufacturer B does not manufacture bicycles or related products.

31. Similarly, in March and April 2016, KHAN sent or caused to be sent one wire in the value of $79,935 described as "IMPORT OF ROTARY HAMMERS." (A rotary hammer is a handheld tool, somewhat similar to a drill.) This wire passed through U.S. Bank C. In reality, based upon my review of KHAN Account A and records obtained via subpoenas, the goods at issue were not rotary hammers but firearms and ammunition manufactured by Chinese Manufacturer A.

32. Specifically, this "rotary hammers" payment related to a purchase of "Type 56" model 7.62 mm rifles and hundreds of thousands of rounds of 7.62 mm

ammunition. Based on my training and experience and my participation in this investigation, I know that a "Type 56" is a variant of the AK-47, widely regarded as one of the most popular assault rifles in the world and often commonly referred to as the "Kalashnikov."

WHEREFORE, your deponent respectfully requests that the defendant NAUSHAD KHAN, be dealt with according to law.

_____
BRIAN P. SHERRY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
6th day of November, 2018

_____
THE HONORABLE ROANNE L. MANN
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK